WILLIAM R. WHITE, as Superintendent of Banks of the State of New York, Appellant, *v.* WILLIAM IDSARDI, Respondent.

WILLIAM R. WHITE, as Superintendent of Banks of the State of New York, Appellant, *v.* ALBERT NELSON, Respondent.

Fourth Department, December 23, 1937.

*John H. O'Day,* for the appellant.

*George B. Doyle,* for the respondents.

EDGCOMB, J. On February 3, 1933, the Bank of Depew was taken over for liquidation by the Superintendent of Banks, in accordance with the provisions of section 57 of the Banking Law. The defendant Idsardi was the record holder of 134 shares of the bank's stock, and the defendant Nelson was the owner of 260 shares. In these actions, brought to enforce payment of the statutory liability imposed upon the owners of bank stock, defendants seek to offset against their liability contributions made by them to the bank on four different occasions prior to February 3, 1933. Two of such payments have been credited against what would otherwise be due from the defendants. The plaintiff appeals.

In 1930 the Bank of Depew found itself in financial difficulties, due largely to the rapid depreciation of its assets in the then falling market. An examination by the Banking Department disclosed the fact that at the close of business on November 22, 1930, the surplus and undivided profits of the bank had been wiped out, and that its capital had been impaired to the extent of $25,629.86. Such a condition could not longer be permitted to exist. One of two alternatives presented itself: the bank must be closed at once, or its assets must be increased so that its capital would be intact. At the instigation of the Banking Department a meeting of the board of directors was called for December 9, 1930, at which time the defendants, along with the other directors, made a contribution in the aggregate sum of $50,000, which not only restored the impaired capital of the institution, but gave it a surplus of substantially $25,000.

The parties do not agree as to the nature of this contribution. Defendants claim that it was a loan, to be repaid when the condition of the bank was such that it could safely be done; the plaintiff insists that it was a donation, given for the purpose of bolstering up the capital structure of the institution so as to enable it to continue business.

So far as the defendants are concerned, the contribution, loan or advancement, by whatever name it may be called, was in the

form of two demand notes, one given by Mr. Idsardi for $2,045, and the other by Mr. Nelson for $4,090, each of which was secured by collateral. The notes were carried as a part of the assets of the bank, and helped to strengthen the capital structure of the corporation.

When this arrangement was consummated on December 9, 1930, the defendants, together with the other directors, signed an instrument, addressed to the Superintendent of Banks, which on its face purports to set forth the terms upon which the contributions were made. The writing recites that the signers contributed " to the profit and loss account of said bank the sum of $50,000 " in the amount set opposite their respective names, and that the contribution should be considered " an absolute gift, subject to no conditions of any kind whatsoever." Then followed a provision that if, at any future time, the bank should desire to return the respective contributions, before accepting the same the signers would " consult with and secure the permission of the Superintendent of Banks of the State of New York." It was optional with the bank whether the contribution should be returned or not, and the Department could override the decision of the corporation, if it was in favor of the contributors.

The court has found that this written instrument, which the defendants admit they voluntarily signed, does not fairly set forth the terms and conditions upon which respondents made their contribution; that they did not read the document, and were fully justified in not doing so; that their minds never gave assent to many of its provisions; that they made their advancements upon the assurance of the Banking Department that they would suffer no financial loss, and that their securities would be returned to them as soon as business improved, and the assets of the bank increased in value to such an extent as to warrant that being done.

I do not think that this finding can stand. It is very true that the defendants, and certain of their associates who were similarly situated, and, therefore, interested in the outcome of this litigation, testified that the bank examiners assured them that they would get their money back. But this evidence is most unsatisfactory. At best it is nothing more than a mere expression of opinion. Some of the witnesses testify only to an impression which they received; others could not say who made the statement. The alleged conversation took place in December, 1930, and the trial of the actions was had in March, 1936. The witnesses were attempting to state their recollection of a conversation which took place over five years before, and they admitted that it was difficult for them to give an accurate statement of what was said, a fact which every one knows

to be true. Such evidence has always been considered weak and unreliable. (*Matter of Buckler*, 227 App. Div. 146, 149, 150, and cases there cited.) The document contained a clause relating to a return of the contribution, if the bank deemed such action proper, and it is quite likely that such provision is what the witnesses had in mind when, in attempting to detail conversations which took place more than five years before, they characterized their advancement as a loan to be repaid to them at a later date.

This evidence is contradicted by the minutes of the meeting of the board of directors held on the day the agreement was signed, in which it was stated that the " directors agreed to personally contribute $50,000 to Profit and Loss account." No reason is forthcoming why these minutes should have been falsified, and I think that we may safely assume that they correctly state what took place at the meeting. Such a record is certainly far more satisfactory and convincing evidence of what occurred than the vague and uncertain memory of interested witnesses who attempt to give in detail a previous conversation.

Again, the arrangement which defendants claim was made would not meet the requirements of the law, and for this reason, if for no other, it is impossible to conceive that the Department would have acceded to such a plan. If these contributions were a mere loan, the financial structure of the bank would not have been strengthened by the transaction, and the impairment of its capital would not have been made good.

Furthermore, the written document signed by defendants cannot be disregarded in determining what the arrangement was under which this advancement was made. The defendants in their answers asked that the writing be reformed to state the agreement as they claimed it to be, but the judgments appealed from contain no such provision. There is no finding that the instrument should be reformed. It stands in its original form.

In the absence of fraud or undue influence, a man is ordinarily bound by an instrument which he signs, even if he never intended to consent to its terms. If he had an opportunity to read it, and failed so to do, he is guilty of gross negligence. If he is unable to read, he is equally careless if he does not have it read to him. In either case the writing binds him. (*Pimpinello* v. *Swift & Co.*, 253 N. Y. 159, 162, 163; *Metzger* v. *Ætna Ins. Co.*, 227 id. 411, 415, 416; *Knight* v. *Kitchin*, 237 App. Div. 506, 511; *Johnson* v. *Star Permanent Wave Corp.*, Id. 868.)

The defendants were not ignorant men, unaccustomed to transact business: they were directors of a bank, and men of affairs in the community in which they lived. It sounds ill in the mouth of

such persons to claim that they are not bound by the terms of an agreement which they voluntarily signed, because it contains a provision which they now claim they did not intend to assent to, when their predicament is due entirely to their unexcusable failure to read the document.

Under the circumstances disclosed by this record, the advancements made by the defendants in December, 1930, cannot be offset against their statutory liability. If the defendants have any claim against the bank, the corporate existence of which has not been extinguished by reason of the Department's taking it over for liquidation (*Lafayette Trust Co.* v. *Higginbotham*, 136 App. Div. 747), they should file it with the liquidator, and share with other creditors in the general assets. They are not entitled to priority over other creditors. (*Richardson* v. *Cheney*, 146 App. Div. 686; affd., 208 N. Y. 541; *Van Tuyl* v. *Schwab*, 165 App. Div. 412.)

Neither can the respondents hope to succeed upon the theory that their advancement was in reality a voluntary payment of their statutory liability as a stockholder. (*White* v. *Bevilacqua*, 273 N. Y. 282.)

This brings us to the second setoff which the defendants claim should be allowed them. After the contribution of the $50,000 made in December, 1930, the financial condition of the bank continued to grow worse, and it was not long before its capital was again impaired. On December 18, 1931, the defendants, with the other directors, entered into an agreement with the bank by which they agreed to deposit certain securities or cash to be held by the bank for the better protection of its depositors. The agreement was to continue in full force and effect until the securities of the bank had appreciated sufficiently, in the opinion of the Banking Department, to protect the depositors, at which time the securities were to be restored to their respective owners. The agreement contained the further provision that in case of liquidation the securities or cash deposited under the agreement were to be applied, if necessary, to the payment of the depositors of the bank, and any balance remaining after the depositors had been paid was to be returned to the parties signing the agreement *pro rata*, and any deficiency arising by reason of the application of the securities or cash to the payment of said depositors should be repaid to the defendants and their codirectors by the bank out of any funds remaining after said depositors had been paid in full.

Idsardi and Nelson paid to the bank $1,500 under this agreement. They have been allowed to offset that sum against their statutory liability. There is a finding that the defendants signed this agreement without reading it, or having it read to them, relying upon

the statements made to them by the bank examiners that they would receive back their securities as soon as the financial condition of the bank would permit. If that were so, it does not, in my opinion, change the rights of the defendants in the premises. They are bound by the agreement which they signed. The allowance which has been made to the defendants under this agreement is not a proper offset against their statutory liability. (*White* v. *Bevilacqua*, 273 N. Y. 282.)

It is urged by the defendants that this action is barred by reason of the repeal of article 8, section 7, of the Constitution of the State of New York, which made a stockholder of every corporation and joint stock association for banking purposes individually responsible to the amount of his respective holdings in any such corporation or association for its debts and liabilities. This section was repealed by a vote of the people at the general election held in 1935.

This action was commenced in January, 1934, prior to the repeal of this constitutional provision. It is quite apparent that this change in the fundamental law of the State did not affect pending actions at the time. Section 113-a of the Banking Law burdens a stockholder with the same liability which the Constitution formerly imposed. That section has not been repealed by the addition of section 113-b* of the Banking Law, except as it applies to stock purchased after June 1, 1936.

The liability of a stockholder in a banking corporation is contractual in its nature. When the stockholder acquires his stock he enters into an implied contract on his part that he will be liable in the manner and to the extent prescribed by the statute, and that liability accrues when the bank incurs the indebtedness for which the statute renders the stockholder liable. (*Van Tuyl* v. *Schwab*, 174 App. Div. 665; affd., 220 N. Y. 661.)

Here the bank became insolvent, and was taken over by the Superintendent in February, 1933; the assessment against the stockholders was made on July eighth of the same year. Certainly the repeal of the constitutional provision regarding the liability of stockholders could in no way affect defendants' liability which had become fixed and determined three years previous to the repeal of the constitutional provision, and which was still an obligation under the statute.

One additional claim of the plaintiff remains for consideration. In an effort to bolster up the financial structure of the bank, its capital stock was increased from $100,000 to $150,000 in August, 1931. Some difficulty was encountered in selling this additional

---

* Added as § 120-a by Laws of 1936, chap. 831, and renumbered by Laws of 1937, chap. 619.—[REP.

stock. In order that the bank might reap the advantage of this increase in its capitalization, the undisposed shares were issued in the name of Elmer J. Nash, president of the bank, and the money with which to pay for the same was obtained by the discount of a note, signed by all of the directors, including the defendants, with the stock pledged as collateral. As any of the stock was sold, the money received from the sale was credited on the note, and the amount of stock was released and turned over to the purchaser. When the State Superintendent took over the bank, 149 shares of this new stock remained unsold. Although it had been issued in the name of Mr. Nash, it is claimed by the appellant that each of the ten directors was an equitable owner of 14.9 shares, and that defendants' statutory liability extends to their interest in such stock.

It is very true that the provisions of section 113-a of the Banking Law apply to an equitable owner as well as a record holder of bank stock. The evidence does not warrant a finding that either defendant ever subscribed for, purchased or owned any of these 149 shares of stock, or that they ever intended so to do. The fact that respondents signed a note by which sufficient money was obtained to get the stock out of the treasury of the corporation does not, in my opinion, make them an equitable owner, or give them any interest in any part of the stock issued to Mr. Nash. The procedure which was followed was adopted for the purpose of satisfying the Banking Department, and giving the bank the benefit of the additional capital, while the stock was being sold to the public. I do not see how it can be said that either defendant was the equitable owner of any portion of the stock issued in the name of Mr. Nash.

It follows that the judgment in the Idsardi case should be modified by providing that the plaintiff recover from the defendant Idsardi the sum of $3,350, with interest thereon from the 8th day of August, 1933, and as modified affirmed, with costs, and that the judgment in the Nelson case should be modified by providing that the plaintiff recover from the defendant Nelson the sum of $6,500, with interest thereon from the 8th day of August, 1933, and as modified affirmed, with costs.

In Idsardi action: All concur. Present — EDGCOMB, CROSBY, LEWIS, CUNNINGHAM and TAYLOR, JJ.

Judgment modified on the law and the facts by providing that the plaintiff recover from the defendant the sum of $3,350, with interest thereon from the 8th day of August, 1933, together with costs, and as modified affirmed, with costs to the appellant. Certain findings

of fact and conclusions of law disapproved and reversed and new findings and conclusions made.

In Nelson action: All concur. Present — EDGCOMB, CROSBY, LEWIS, CUNNINGHAM and TAYLOR, JJ.

Judgment modified on the law and the facts by providing that the plaintiff recover from the defendant the sum of $6,500, with interest thereon from the 8th day of August, 1933, together with costs, and as modified affirmed, with costs to the appellant. Certain findings of fact and conclusions of law disapproved and reversed and new findings and conclusions made.